# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **Billy L. Spears,** | |
| Plaintiff, | |
| **v.** | |
| **Steven McCraw, David Baker, Jack Webster, Michael Bradberry, Audra Livingston, Stephen P. Mach, Manny Flores, A. Cynthia "Cindy" Leon, Jason K. Pulliam, Randy Watson, Faith Johnson, Luis Gonzalez, Rhonda Fleming, Luis Sanchez, K.B. Wilkie, Brandon Negri, Jimmy Jackson, and Marcus Stokke, Willie Drabble, and Michael Sparks,** | **Case No. 1:17-cv-1105-RP** |
| Defendants | |

## SECOND AMENDED COMPLAINT

NOW COMES Billy L. Spears, the Plaintiff herein, alleging and stating as follows:

## INTRODUCTION

1.  The Plaintiff incorporates by reference his ORIGINAL PETITION in *Billy L. Spears v. Texas Department of Public Safety, et al.*, Case No. 1:15-cv-00511-RP (W.D. Tex.) (hereinafter *Spears I*), which is attached as Appendix 1. After *Spears I* was filed in this Court, some of the Defendants doubled down on their campaign of retaliation against the Plaintiff. High-ranking personnel in the Texas Department of Public Safety tampered with documents and forged signatures in an attempt to get the Plaintiff, a state trooper, terminated from the Department.

Their plan unraveled for the most part, but they caused the Plaintiff to transfer to a different job assignment and he now has a disciplinary record as a result of the forged documents. The Upshur County District Attorney investigated the forgeries and referred the case to the Texas Attorney General for further investigation and / or prosecution.

2. Some significant events have occurred since the filing of the Plaintiff's First Amended Complaint. Former DPS special agent Darren Lubbe filed a complaint in this Court alleging a culture of corruption and retaliation at DPS, and the Plaintiff incorporates that complaint herein by reference. *See* ORIGINAL COMPLAINT, *Darren Lubbe v. Mark Milanovich, et al.*, Case No. 1:18-cv-01011 (W.D. Tex.), attached as Appendix 2. The *Lubbe* COMPLAINT details a pattern of corruption, cover-ups, and retaliation at the highest levels of DPS, and after it was filed the Plaintiff became aware of additional evidence reflecting of corruption and retaliation within DPS. Some of that additional evidence is set forth herein.

## JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff asserts federal claims under 42 U.S.C. § 1983.

4. Venue is proper in this Court because some of the Defendants reside in Travis County, Texas and some of the relevant acts occurred in Travis County. Furthermore, this case arises because the Defendants retaliated against the Plaintiff for filing *Spears I*, which was pending in this Court at all times relevant.

## PARTIES

5. Plaintiff Billy L. Spears is a trooper with the Texas Highway Patrol, a division of the Texas Department of Public Safety (hereinafter "DPS").

6. Defendant Steven McCraw is the director of DPS.

7.   Defendant David Baker was the deputy director of DPS at all times relevant.

8.   Defendant Jack Webster was the regional commander of DPS for Region 1 at all times relevant.

9.   Defendant Michael Bradberry is a major in the Texas Highway Patrol.

10.   Defendant Audra Livingston was a captain in the Texas Highway Patrol at all times relevant.

11.   Defendant Stephen P. Mach is the chairman of the Texas Public Safety Commission, which oversees the DPS.

12.   Defendant Manny Flores is a member of the Texas Public Safety Commission.

13.   Defendant A. Cynthia "Cindy" Leon is a member of the Texas Public Safety Commission.

14.   Defendant Jason K. Pulliam is a member of the Texas Public Safety Commission.

15.   Defendant Randy Watson is a member of the Texas Public Safety Commission.

16.   Defendant Faith Johnson is the former Dallas County District Attorney. She served as a member of the Texas Public Safety Commision from May of 2014 until January 31, 2016.

17.   Defendant Luis Gonzalez was an assistant director of DPS and the chief of the Texas Highway Patrol at all times relevant.

18.   Defendant Rhonda Fleming is the inspector general of DPS.

19.   Defendant K.B. Wilkie was a captain in the Texas Highway Patrol at all times relevant.

20.   Defendant Brandon Negri is a lieutenant in the Office of Inspector General ("OIG") of the Texas Department of Public Safety.

21.   Defendant Jimmy Jackson was a lieutenant in the Texas Highway Patrol at all times

relevant.

22.   Defendant Marcus Stokke is a former sergeant with the Texas Alcoholic Beverage Commission.

23.   Defendant Michael Sparks is a sergeant with the Texas Highway Patrol. He formerly served as the Plaintiff's immediate supervisor.

24.   Defendant Willie Drabble is a sergeant in the Texas Highway Patrol. He served as the Plaintiff's immediate supervisor while Defendant Sparks was on disciplinary suspension in 2016.

## FACTS

25.   Defendant McCraw and his senior command staff routinely blacklist and retaliate against DPS employees who question senior leadership, report misconduct, or do anything that Defendant McCraw deems embarrassing to him or the agency. *See Lubbe* COMPLAINT. When the Plaintiff filed *Spears I* on or about April 29, 2015, he had already been disciplined and blacklisted by Defendants McCraw, Baker, Webster, Livingston, and Jackson for (1) allowing himself to be photographed in uniform with Calvin Broadus, a.k.a. "Snoop Dogg," whom Defendant McCraw described as a "dope-smoking cop hater"; and (2) filing a misconduct complaint against a law enforcement officer from another state agency.[1] When the Plaintiff revealed that he had been reprimanded for the photograph, the incident attracted negative media attention for DPS from around the world. When Defendant McCraw's email describing Snoop Dogg as a "dope-smoking cop hater" was released to the media a few weeks later, DPS and Defendant McCraw endured another round of negative international media attention. Finally,

---

1   Defendant McCraw and DPS commanders have a taboo against filing misconduct complaints against law enforcement officers from other agencies, particularly other state agencies.

these Defendants were publicly embarrassed yet again when the Plaintiff filed *Spears I*. These events only increased the Defendants' determination to blacklist and retaliate against the Plaintiff.

26.   On April 17, 2016, while *Spears I* was still pending, the Plaintiff aggravated an old knee injury while he was on duty in Pittsburg, Texas. He met with his primary care physician on April 26, 2016, and the following day his physician wrote a letter recommending that he be exempted from the DPS's semi-annual physical fitness test until he could be seen by a specialist.

27.   The Plaintiff was originally scheduled to see an orthopedist on May 25, 2016, but a day or two before that date his orthopedist postponed the appointment until June 8, 2016.   The Plaintiff informed his acting supervisor, Defendant Drabble, on May 23 or May 24 that he could not see an orthopedist before the end of the testing period, and Defendant Drabble advised the Plaintiff to write a memo to his captain, Defendant Audra Livingston.

28.   The Plaintiff drafted a memo to Defendant Livingston and showed it to Defendant Drabble, who read it and said, "That's right." Sgt. Drabble advised the Plaintiff to fill out a waiver form for the physical-fitness test, and the Plaintiff did so.   Sgt. Drabble signed and dated the request, checked the box recommending approval, and then submitted both the waiver form and the memo to the Plaintiff's chain of command.

29.   On May 26, 2016, while the Plaintiff was en route to a work assignment on the Mexican border, Corporal Sandy Taylor called the Plaintiff and told him that their lieutenant, Defendant Jimmy Jackson, said the Plaintiff would need a medical evaluation before he could continue working. The Plaintiff advised Cpl. Taylor to fax the form to his physician, and Cpl. Taylor faxed it on May 26, 2016.   The Plaintiff's physician signed the form and returned it to Cpl. Taylor on May 27, 2016.   On May 31, 2016, the Plaintiff was informed that he was unfit for

duty and he was ordered to return to East Texas.

30.    After returning to East Texas on June 1, 2016, the Plaintiff advised Cpl. Taylor by telephone that he would return to the local office the following day to complete paperwork. About an hour-and-a-half later, Cpl. Taylor called the Plaintiff and said Defendant Livingston had forbidden the Plaintiff from returning to the office, even to complete paperwork. The Plaintiff's supervisors placed him on paid medical leave.

31.    The Plaintiff had surgery on his knee on June 30, 2016, but because of complications he did not return to work until December 17, 2016.  He was thus absent from the office from May 26, 2017 until December 17, 2016.  Because of his ongoing recovery, the Plaintiff was unable to pass the physical-fitness test ("PFT") during the Fall of 2016 and Spring of 2017.  In fact, the Plaintiff never attempted to pass the PFT because (1) he was on medical leave and exempt from the test according to DPS policy, and (2) nobody told him that they were expecting him to take the test while he was on medical leave.

32.    Although the Plaintiff was exempt from the PFT by policy, the Defendants saw an opportunity to retaliate for the events related to *Spears I*.  The Defendants deliberately misclassified the Plaintiff as being non-compliant with DPS policy because he had not taken and passed a physical fitness test while he was on medical leave.  As a result of the bad-faith misclassification, the Plaintiff ultimately was placed on a performance improvement plan ("PIP") on September 1, 2017 and warned that he was on the verge of being terminated. The PIP was signed and served on the Plaintiff by Defendant Sparks at the direction of Defendant Bradberry. Within DPS, a PIP is a form of discipline insofar as it remains in an employee's permanent file and weighs against promotion or advancement, regardless of whether the employee successfully completes the PIP.  The Defendants were not merely trying to hurt the Plaintiff's career,

however, they were trying to get him fired for filing *Spears I*.

33.    Prior to September 1, 2017, the Defendants never told the Plaintiff that they expected him to complete physical fitness tests while he was on medical leave and while he was recovering from knee surgery.  Similarly, the Defendants never told the Plaintiff that his request for a medical waiver in 2016 had been denied. Instead, they waited until after they put him on the PIP. As soon as the Plaintiff was informed that he was on a PIP, he asked his immediate supervisor, Defendant Sparks, to obtain copies of all documents indicating that his waiver request had been denied.

34.    On September 4, 2017, the Plaintiff took the physical-fitness test again and passed it with a high enough score to be rewarded with 12 hours of paid leave. As a result, he was released from the PIP. Nonetheless, the PIP remains in his file as a disciplinary incident, and as a result the Plaintiff is less likely to be promoted or advanced.

35.    On September 11, 2017, the Plaintiff was finally provided copies of the documents purporting to indicate why he had been denied a medical waiver, and those documents were forgeries. The memo that the Plaintiff wrote on May 23, 2016 or May 24, 2016, for example, had been altered and post-dated to June 2, 2016.  The date alteration was significant because it created the false appearance that the Plaintiff had not submitted his memo before the May 31, 2016 deadline, *i.e.*, it created the false appearance that the Plaintiff was not in compliance. The forgery is readily provable because the Plaintiff could not have written and signed the memo on June 2, 2016 – as of that date, he had been excluded from the office because he was on medical leave. Contemporary documents show that Cpl. Taylor had to sign the Plaintiff's time sheets during that period because the Plaintiff could not report to the office. The altered memo also mentions a conversation between the Plaintiff and Cpl. Taylor that did not occur until after the

Plaintiff's memo was written. Similarly, the altered memo referenced a medical test that had not occurred as of the date that the Plaintiff's memo was written.

36. It appears that one or more Defendants electronically cut the Plaintiff's signature from another document and then pasted it onto the altered memo. As of this date, DPS personnel still cannot produce the original version of the document that is dated June 2, 2016.

37. The Defendants also tampered with the waiver request form. The document was post-dated to June 1, 2016 (again, to make the Plaintiff's waiver request appear untimely), even though the Plaintiff was already on medical leave as of that date and even though other DPS records indicate that the waiver form was received on May 26, 2017. Defendant Drabble's handwritten signature was replaced with a stamped signature, and his handwritten date was replaced with a typewritten date of June 2, 2016, which was after the time that he and the Plaintiff were working together. Defendant Livingston dated his signature June 5, 2016, but the "5" was marked out and replaced with a "3." That "3" is not similar to Defendant Livingston's handwriting, but it is identical to a "3" that is handwritten by Defendant Bradberry next to his signature. On information and belief, Defendant Bradberry was responsible for altering and forging the memo as well as the medical waiver request. Defendants Webster and Baker knew the waiver request form was a forgery, but they signed it anyway.

38. When signed by a physician, medical waivers are granted *pro forma* to all DPS employees except one: the Plaintiff. As explained herein, the Plaintiff was singled out and his waiver request was denied because the Defendants were retaliating against him for filing *Spears I*. The Plaintiff is personally aware of the following DPS personnel who went on medical leave due to knee injuries similar to the Plaintiff's, yet were neither required to take a PFT nor placed on a PIP: Chad Martin, Chris Hughes, Larry West, Paul Kendrick, Woody Foster, Tony

Delacerda, Isaac Flores, Cody Carter, Jim Cane, Ed Carpenter, and Mike Hearn. The Plaintiff alleges that he is the only DPS employee ever denied a waiver for a medically-documented injury or illness, the only DPS employee ever expected to complete a physical fitness test while he was on leave due to illness or injury, and the only DPS employee who was ever placed on a PIP because he could not complete a physical fitness test due to a documented illness or injury *for which he had already been granted medical leave*.

39.   To be clear, the Defendant supervisors acknowledged that the Plaintiff was injured seriously enough to be on medical leave, but they simultaneously required him to take a physical fitness test for a job that he was unable to perform because of the same injury. Worse, they did not bother giving him notice that they had denied his request for a waiver, nor did they give him notice that they were expecting him to take a physical fitness test while he was on medical leave. There is only one explanation for these events: the Defendants withheld notice because they were setting up the Plaintiff for discipline and ultimately for termination.[2]   In turn, the only reasons for denying the waiver and treating the Plaintiff differently from all other employees were the events underlying *Spears I*, the filing of *Spears I*, and the resultant negative media attention.  There is no other explanation for the disparate treatment. Finally, the Defendants not only treated the Plaintiff differently from all comparably-situated employees, they violated DPS policy in doing so. According to agency policy, the Plaintiff was not required to complete a physical fitness test while he was on leave due to an injury, and a DPS fitness counselor subsequently admitted to the Plaintiff that he never should have been placed on a PIP in the first place. The counselor further stated that the PIP appeared to be retaliatory. As noted above, the PIP remains in the Plaintiff's

_____

2    If the Plaintiff had known his waiver was denied, he could have at least reapplied for a waiver or objected to the double standard.  The Plaintiff alleges that the Defendants denied him due process by denying him notice of their adverse decision.

file and impedes his opportunities for promotion or advancement.

40.    Among the records obtained by the Plaintiff on September 11, 2017 was a note dated June 3, 2016 from Defendant Bradberry, a senior commander in the Garland office, recommending that Defendant Livingston deny the Plaintiff's request for a waiver. As explained above, those requests are normally granted pro forma when accompanied by a physician's recommendation. In his note, however, Defendant Bradberry faulted the Plaintiff because he did not pass the 2015 testing cycle with a higher score. To be clear, the Plaintiff passed the test in 2015 according to DPS policy, but Defendant Bradberry decided after the fact in 2016 that the Plaintiff should have had a higher score. Defendant Bradberry retroactively fabricated a different standard for the Plaintiff versus all other DPS employees, and he did so as a pretext for retaliation. No DPS employee had ever been punished before nor has one been punished since because his or her *passing* grade on the physical fitness test was not higher.  Furthermore, a DPS employee's score on a previous physical fitness test is not grounds for denying a medical waiver under DPS policy. This is only a matter of common sense: an employee's *passing* grade on an earlier test has no bearing on whether or not that employee was subsequently injured and thus unable to take a subsequent test. The Plaintiff's knee injury was completely beyond his control, and a higher score in 2015 would have had no bearing on his knee injury. Defendants Livingston, Bradberry, Webster, and Baker had never before blocked a medical waiver on that basis, and they have never blocked one since. The Defendants were aware since 2008 that the Plaintiff had ongoing medical problems with his knee, and they never made an issue of it before. They refused to make a reasonable medical accommodation in 2016, however, because they were retaliating for the events outlined in *Spears I*, the filing of *Spears I,* and the resultant negative media attention. There was no other reason for the Defendants to fabricate a different standard for the

Plaintiff versus all other DPS employees, much less to do so in violation of DPS policies.

41.   Even though Defendant Drabble originally recommended approval of the Plaintiff's waiver request, everyone else in his chain of command did not, *i.e.*, Defendant Livingston, Defendant Bradberry, Defendant Webster, and Defendant Baker. Defendants McCraw, Baker and Bradberry were named as defendants in *Spears I*, and Defendant Webster personally carried out McCraw's orders for retaliatory discipline in *Spears I*.   Defendants Livingston, Bradberry, Webster, and Baker denied the medical waiver for the ultimate purpose of putting the Plaintiff on a PIP and getting him fired. Insofar as Defendant McCraw had previously ordered retaliatory discipline against the Plaintiff in *Spears I*, and insofar as Defendant Baker was his immediate deputy, the Plaintiff alleges that Defendant McCraw was aware that the other Defendants were planning to deny the Plaintiff's medical waiver (and withhold notice). In other words, Defendant McCraw was aware of the plan to retaliate against the Plaintiff, and he tacitly or directly authorized it.

42.   The Plaintiff alleges that the denial of his medical waiver and the resulting PIP were a continuation of the conspiracy that began in *Spears I*, namely a conspiracy to retaliate against the Plaintiff for exercising his constitutional rights. Defendant Stokke helped initiate the campaign of retaliation by making false allegations against the Plaintiff in order to cover up his own misconduct. *See Spears I* COMPLAINT.   Defendants Fleming and Negri then conducted a sham investigation of the Plaintiff, using the discredited and self-contradictory testimony of Defendant Stokke to sustain a finding of misconduct even though the Plaintiff had not violated any DPS rule or policy. Defendants Gonzales and Wilkie knew that the Plaintiff had not violated any rule or policy, and they knew that the purpose of the investigation was retaliatory, but they nonetheless imposed discipline on the Plaintiff anyway. When the Plaintiff fought back by filing

*Spears I*, the Plaintiff's chain of command responded by denying the Plaintiff's medical waiver and trying to get him fired. Such retaliation is standard operating procedure in DPS, and it is well known throughout the ranks of DPS employees.

43. Luis Sanchez recently retired as the deputy inspector general for DPS, and he was named as a defendant in the First Amended Complaint. He is no longer a defendant. Based on statements that Mr. Sanchez has made to third parties, the Plaintiff alleges that Mr. Sanchez will testify to widespread corruption and cronyism in DPS (and specifically within OIG), and that such corruption and cronyism is known to Defendant McCraw as well as Defendants Mach, Flores, Leon, Pulliam, Watson, and Johnson (hereinafter the "Commissioner Defendants"). The inspector general, Defendant Fleming, reports directly to the Commissioner Defendants, and OIG has become the "Office of Damage Control" under her leadership. *See, generally, Lubbe* Complaint.

44. OIG is rife with its own misconduct and conflicts of interest. When Defendant Fleming became inspector general, she drove out most of the personnel selected by her predecessor and began replacing them with female officers, several of whom she either had or was having sexual relationships with. While she was a sergeant and serving as a counselor for Trooper Recruit School B-2002, Defendant Fleming carried on a romantic affair with one of the female recruits and later lied to cover up the affair. She is totally unfit to serve as inspector general, but the Commissioner Defendants keep her employed because she is quite effective at damage control.

45. Rather than try to protect the integrity of DPS, OIG functions primarily to save its commissioners and senior leadership from public or political embarrassment. It is widely known within DPS that OIG covers up misconduct to protect politically-favored DPS employees.

Likewise, it is widely known within DPS that OIG routinely conducts tainted investigations for the purpose of harming politically-disfavored employees like the Plaintiff. Based on his statements to third parties, the Plaintiff alleges that Mr. Sanchez will testify that Defendant McCraw and the Commissioner Defendants were fully aware of these facts.

46.   As further evidence of the taint within OIG, the Plaintiff would direct the Court's attention to Paragraph 70 of the LUBBE COMPLAINT. After that complaint was filed, Plaintiff's Counsel obtained a copy of OIG's investigation of former Ranger Brent Davis. The "investigation" was a farce. Mr. Davis and Faezah Horaney should have been interrogated as murder suspects, but instead the OIG investigator just accepted Mr. Davis's self-serving statements (*e.g.*, that he did not know Mrs. Horaney before the murder) as true without any corroboration. OIG did not interview Mrs. Horaney or any other witnesses.  As one would expect, OIG whitewashed the incident in order to save DPS from embarrassment.

47.   In April of 2016, Corporal Katherine Gibson (formerly Creekmore) filed a misconduct complaint against Captain Rolando Rivas because he was showing favoritism toward a subordinate, Trooper Diane Martinez, with whom he appeared to be having an inappropriate relationship. OIG initiated an investigation, and within a matter of weeks Captain Rivas began cleaning out his office. At one point, the captain's secretary discovered a note in his office that caused her and other co-workers to fear that Captain Rivas might harm himself. A short time later, however, the chairman of the Texas Senate's Criminal Justice Committee intervened with Defendant McCraw on behalf of Captain Rivas, and the OIG investigation was quashed. As it happens, Trooper Martinez had boasted about having an intimate relationship with the married committee chairman, Senator John Whitmire.

48.   After Defendant McCraw quashed the investigation, Captain Rivas was allowed to

resume his position in Cpl. Gibson's chain of command. Predictably, he began retaliating against her with numerous bad-faith accusations and disciplinary write-ups. The stress became so severe that Cpl. Gibson sought and obtained medical leave in May of 2017 due to harassment from her chain-of-command. She filed a second misconduct complaint against Captain Rivas in July of 2018, as well as complaints against Lieutenant Glen Lester and Sgt. Rito Morales, because of the ongoing retaliation scheme. Since that time, Defendant Fleming has deliberately slow-walked the investigation, Lieutenant Glen Lester and Sgt. Rito Morales have been allowed to transfer and Captain Rivas is scheduled to retire on February 28, 2019. This is standard operating procedure for Defendant McCraw and Defendant Fleming. When they can no longer cover up misconduct by a senior officer, the investigation is delayed and the senior officer is allowed to retire quietly. *See also Lubbe* COMPLAINT. By delaying her findings, Defendant Fleming can close the investigation without sustaining any of the allegations. As a result, the report will not be subject to public release, and DPS will be saved from embarrassing revelations.

49. Cpl. Gibson will testify that cronyism and retaliation are systemic within DPS, and that retaliation is particularly common against female officers who report misconduct. In one instance, a former female trooper informed Cpl. Gibson that her estranged husband, a current Lieutenant, had secretly installed DPS surveillance equipment in her vehicle as they were in divorce proceedings. The estranged wife (now ex-wife) tried reporting this to his chain-of-command and OIG, but OIG refused to call her back. Despite clear evidence that the male lieutenant violated DPS policy and committed a crime, OIG will not investigate and DPS has taken no action against him.

50. As further evidence of a conspiracy against the Plaintiff, the Plaintiff would point to Paragraphs 74-75 of the LUBBE COMPLAINT. After that complaint was filed, the Plaintiff learned

that Defendant Drabble lied to an investigator from the Dallas County District Attorney's Office regarding the date and authenticity of his signature on the medical waiver request. Specifically, Defendant Drabble told the investigator that the date on the forged waiver was correct, and that his stamped signature on the form was authentic. At least two witnesses will testify that Defendant Drabble signed his name on the original waiver form rather than stamping it, and that he signed the form several days earlier than the date affixed to the forged waiver form. Defendant Drabble gave the same false statement to an OIG investigator that he gave to the DA investigator, and the Plaintiff alleges that Defendant Drabble was directed to do so by Defendant Bradberry.

51. OIG could have easily disproved Defendant Drabble's testimony by obtaining his contemporary travel records, but OIG neither requested nor obtained such records, and that's because OIG was more interested in covering up Defendant Bradberry's misconduct. The Defendants violated the Plaintiff's equal protection rights by trying to cover up the forgery. *See Ryland v. Shapiro*, 708 F.2d 967, 974 (5th Cir. 1983). Likewise, their after-the-fact attempts to cover up the forgery are strong evidence of a conspiracy. *See Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 691 (S.D.N.Y. 2004). Defendant Fleming is personally aware of the cover-up, and she has done nothing to stop it. Likewise, Defendant McCraw is personally aware of the evidence that Defendant Bradberry forged records, but he allowed the investigation to be transferred to OIG because he knew OIG would cover up the forgery. Defendant McCraw, Defendant Fleming and the Commissioner Defendants knowingly tolerate cronyism and corruption throughout DPS, and because of that Defendant Bradberry and Defendant Drabble knew that their superiors would cover up Defendant Drabble's false statements.

52. The Commissioner Defendants were aware of the DPS's history of retaliating against the Plaintiff because the Plaintiff had previously sued DPS and some of the Defendants herein (including Defendant McCraw) in *Spears I* for retaliating against him. The filing of *Spears I* was reported by the Associated Press on April 29, 2015 and published in newspapers across Texas and the United States as well as countries around the world. The Associated Press story noted that *Spears I* alleged the Plaintiff was retaliated against because (1) he filed a misconduct complaint against a law enforcement officer from another agency and (2) he allowed himself to be photographed with Calvin Broaddus (a.k.a. "Snoop Dogg") while working off-duty. Furthermore, the Plaintiff alleges on information and belief that Defendant McCraw and the Commissioner Defendants were briefed about *Spears I* by the Office of the Attorney General of Texas. Notwithstanding such notice, Defendants Webster, Baker, McCraw, Mach, Flores, Leon, Pulliam, Watson, and Johnson failed to supervise the other Defendants who kept retaliating against the Plaintiff.

<u>CLAIMS</u>

*42 U.S.C. § 1983*

53. All prior paragraphs are incorporated herein by reference. The Plaintiff alleges that the Defendants participated in a conspiracy to violate his civil rights.

54. The Plaintiff brings claims for damages against all Defendants under 42 U.S.C. §1983 because they (1) retaliated against him for exercising his right to free speech and his right to petition for redress of grievances as guaranteed by the First Amendment to the U.S. Constitution; (2) conspired with other Defendants who retaliated; or (3) failed to supervise those who retaliated.

55. The Plaintiff brings claims for damages against all Defendants under 42 U.S.C.

§1983 because they (1) denied him due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution; (2) conspired with other Defendants who denied him due process; or (3) failed to supervise those who denied him due process.

56.   The Plaintiff brings claims for damages against all Defendants under 42 U.S.C. §1983 because they (1) denied him equal protection as guaranteed by the Fourteenth Amendment to the U.S. Constitution; (2) conspired with other Defendants who denied him equal protection; or (3) failed to supervise those who denied him equal protection.

57.   Notwithstanding any other statement in this complaint, the Plaintiff brings claims for damages against the Defendants only in their individual capacities.

## REQUEST FOR RELIEF

58.   The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Billy L. Spears**

# Appendix 1

# IN THE _____ DISTRICT COURT
## TRAVIS COUNTY, TEXAS

| | |
|---|---|
| **BILLY L. SPEARS,**<br>  **Plaintiff,**<br><br>**v.**<br><br>**TEXAS DEPARTMENT OF PUBLIC SAFETY, STEVEN McCRAW, DAVID BAKER, LUIS GONZALEZ, RHONDA FLEMING, MICHAEL BRADBERRY, LUIS SANCHEZ, K.B. WILKIE, BRANDON NEGRI, JIMMY JACKSON, and MARCUS STOKKE**<br>  **Defendants** | NO. _____ |

## ORIGINAL PETITION

NOW COMES Billy L. Spears, the Plaintiff herein, and alleges and states the following:

### JURISDICTION AND VENUE

1.     Venue and jurisdiction are properly found in this Court because Travis County was the site of many of the illegal acts described herein, and because several of the Defendants are residents of Travis County.

### PARTIES

2.     Plaintiff Billy L. Spears is a trooper with the Texas Highway Patrol, a division of the Texas Department of Public Safety (hereinafter "DPS"), and he is currently assigned to Camp County. He can be served with process via his attorney at the address below.

3.     Defendant DPS can be served with process via the Attorney General of Texas at his office at 300 W. 15th Street, Austin, Texas 78701.

4.     Defendant Steve McCraw is the director of DPS.  He can be served with process

at his office at 5805 North Lamar Blvd., Austin, Texas 78752-4431.

5.      Defendant David Baker is the deputy director of DPS. He can be served with process at his office at 5805 North Lamar Blvd., Austin, Texas 78752-4431.

6.      Defendant Luis Gonzalez is the assistant director of DPS and the chief of the Texas Highway Patrol. He can be served with process at his office at 5805 North Lamar Blvd., Austin, Texas 78752-4431.

7.      Defendant Rhonda Fleming is the inspector general of DPS. She can be served with process at her office at 5805 North Lamar Blvd., Austin, Texas 78752-4431.

8.      Defendant Michael Bradberry is a major in the Texas Highway Patrol. He can be served with process at his office at 350 West IH-30, Garland, Texas 75043.

9.      Defendant Luis Sanchez is a captain in the Office of Inspector General of DPS. He can be served with process at his office at 5805 North Lamar Blvd., Austin, Texas 78752-4431.

10.     Defendant K.B. Wilkie is a captain in the Texas Highway Patrol. He can be served with process at his office at 5805 North Lamar Blvd., Austin, Texas 78752-4431.

11.     Defendant Brandon Negri is a lieutenant in the Office of Inspector General of the Texas Department of Public Safety.  He can be served with process at his office at 350 West IH-30, Garland, Texas 75043.

12.     Defendant Jimmy Jackson is a lieutenant in the Texas Highway Patrol.  He can be served with process at his address at 4700 TX-248 Spur, Tyler, Texas 75701.

13.     Defendant Marcus Stokke is a sergeant with the Texas Alcoholic Beverage Commission. He can be served with process at his office at 2800 Gilmer Road, Suite 4, Longview, Texas 75604-1824.

FACTS

14.    On May 10, 2014, Trooper Billy Spears and Trooper Manuel Ponce attended a concert at Lake Fork in plain clothes and while off duty. Both men attempted to carry alcoholic drinks from one area of the concert to another, but they were stopped by a security guard who told them that they could not carry the drinks beyond that point. While they were speaking with the security guard, Defendant Marcus Stokke approached the men and, in a threatening tone, told them that they could be arrested for a Class A misdemeanor if they crossed the line. The troopers said they were not aware that they were prohibited from carrying alcohol across the line, and Trooper Ponce asked if he could throw his drink in a nearby trash can. Trooper Spears remarked that Trooper Ponce had better throw the drink to the trash can so he would not step across the line. Sgt. Stokke demanded to know whether Trooper Spears was "getting smart" with him, and Trooper Spears replied that he was not. Sgt. Stokke then said he could arrest Trooper Spears for public intoxication, and Trooper Spears responded that he was not intoxicated, and that in order to arrest a person for public intoxication, that person had to be a danger to himself or others. When Sgt. Stokke disputed that and boasted that he was a sergeant over 24 counties, Trooper Spears explained that he, too, was a state law enforcement officer, and that he was personally familiar with the law (prior to that time, neither Trooper Spears nor Trooper Ponce mentioned the fact that they were law enforcement officers). This enraged Sgt. Stokke even further, and he detained Trooper Spears even though he had no reason to believe that Trooper Spears had violated any law. Sgt. Stokke summoned two game warden captains as well as other troopers and game wardens, and he gave conflicting explanations of his reason for detaining Trooper Spears, but none of those officers saw any evidence that Trooper Spears was intoxicated. Eventually, Trooper Spears was released.

15.     Insofar as Sgt. Stokke committed a Class A misdemeanor by unlawfully detaining Trooper Spears, *see* Tex. Penal Code §39.03, Trooper Spears filed a complaint with TABC and reported the matter to the Texas Rangers as well as his superiors in DPS.  Rather than investigate Sgt. Stokke, however, Trooper Spears's superiors at DPS filed a disciplinary complaint against Trooper Spears because he had the audacity to file a complaint against another law enforcement officer.

16.     On May 28, 2014, Captain Luis Sanchez forwarded an email from Major Bradberry to Inspector General Fleming with the following comment:

> *Rhonda,*
>
> *I reviewed and recommend a division referral. Basically, the way it began is because Trooper Spears filed a complaint with TABC internal affairs.*
>
> *Thanks,*
> *Louis Sanchez, Captain*

In other words, Captain Sanchez admitted that Trooper Spears was being punished because he exercised his First Amendment rights by filing the complaint against Sgt. Stokke.

17.     In separate interviews conducted by DPS investigators, meanwhile, Sgt. Stokke gave conflicting stories about why he detained Trooper Spears.  In a June 9, 2014 memorandum, Trooper Spears's immediate supervisor, Sgt. Michael Sparks, explained that he interviewed various witnesses to the incident between Trooper Spears and Sgt. Stokke, including Sgt. Stokke himself, and that there were numerous inconsistencies in Sgt. Stokke's story.  Sgt. Stokke's account also contradicted the statements given by the two game warden captains who were present.  On some occasions Sgt. Stokke said he detained Trooper Spears because he thought he was intoxicated, but on other occasions he said he detained Trooper Spears for suspicion of impersonating a peace officer.

18.     After completing his initial draft of the memorandum, Sgt. Sparks was directed by his superiors to find fault with Trooper Spears, so he wrote that "[i]t is also my opinion that Trooper Spears did not act in accordance to [sic] Policy. When confronted by law enforcement, whether they are right or wrong it is our duty to abide by their instructions given at that time." Trooper Spears respectfully disagrees, as does the United States Supreme Court. No one in this country is obligated to comply with an unlawful arrest or detention. Even Sgt. Sparks's report acknowledges that it appears Sgt. Stokke got angry because Trooper Spears "called his bluff." Sgt. Stokke thought he could impress a security guard by bullying a couple of civilians, and the stunt blew up in his face. Rather than admit his mistake, Sgt. Stokke doubled down on it and, in the process, he committed a crime.

19.     Sgt. Sparks's investigation was only the first in a series of investigations conducted by DPS personnel. The records from those investigations repeatedly show contradictions in Sgt. Stokke's testimony, and those records further give probable cause to believe that Sgt. Stokke committed a crime, yet the DPS personnel consistently attacked Trooper Spears's credibility and sided with Sgt. Stokke. Defendants Jackson, Negri, Wilkie, Sanchez, Bradberry, Fleming, and Gonzalez all participated in a sham investigation / disciplinary process that was designed to punish Trooper Spears for filing a complaint against another cop.

20.     Ultimately, Trooper Spears's superiors ordered him suspended without pay. Trooper Spears appealed that decision all the way to Defendant McCraw, the director of DPS. In a letter dated January 23, 2015, Defendant McCraw wrote as follows:

> *After reviewing the investigative file and carefully considering your points of contention, I have determined that allegation #1 should have been classified as "Not Sustained." As a result of my decision, no disciplinary action will be taken against you. You will receive performance counseling from your chain of command.*

It thus appeared that Defendant McCraw had exonerated Trooper Spears. As Trooper Spears

would soon learn, however, "performance counseling" is a DPS euphemism for a special sort of reprimand that cannot be appealed. On February 4, 2015, Defendant Jackson served Trooper Spears with a "Counseling Record," and under the heading "DEFICIENCIES INDICATING NEED FOR COUNSELING" it stated as follows:

> *While attending an off-duty event at Lake Fork, Trooper Spears obtained an alcoholic beverage and attempted to take that beverages [sic] to another location. He was stopped by a security guard and told he could not leave with the alcoholic beverage. Rather than comply with the instructions, Trooper Spears engaged the security guard in conversation and questions. The interaction resulted in TABC agents and TWPD Game Wardens responding. During the incident, Trooper Spears identified himself as Trooper, but did not have any credentials with him. Trooper Spears' [sic] conduct was unprofessional [and] reflected poorly on the Department.*

Beneath the heading "REASONS GIVEN BY EMPLOYEE FOR DEFICIENCIES," Trooper Spears wrote: "I don't agree with this. My signature is affixed to comply with policy." Apparently, that statement further offended the DPS Defendants named in this lawsuit.

21.     Less than two months after signing the "Counseling Record," Trooper Spears worked an approved off-duty job as backstage security at the SXSW concert in Austin. While Trooper Spears was working backstage, an assistant to Calvin Broaddus, a.k.a. "Snoop Dogg," asked if he could take a photograph of Snoop Dogg standing next to Trooper Spears. Trooper Spears agreed, and the Doggfather's assistant later posted the photograph to Instagram with the caption "Me n my deputy dogg."

22.     On March 24, 2015, Trooper Spears was informed by Sgt. Sparks that Defendant Jackson would be driving from Tyler to Gilmer to serve him with a copy of another "Counseling Record." Defendant Jackson drove 80 miles round trip to serve Trooper Spears at 9:24 p.m. in the evening. Sgt. Sparks also told Trooper Spears that DPS supervisors were now requiring the presence of two superior officers for any incident involving Trooper Spears. Trooper Spears is not aware of any other trooper who has been singled out for such unusual treatment.

23.     Shortly before Trooper Spears was served with the "Counseling Record," Sgt. Sparks said he was looking at Trooper Spears from behind to see if he had a target on his back. According to Sgt. Sparks, the disciplinary action was initiated by Defendant Baker after Trooper Spears's photograph was detected during routine scanning of social media.

24.     Under the title "DEFICIENCIES INDICATING NEED FOR COUNSELING," the "Counseling Record" alleged as follows:

> *While working a secondary employment job, Trooper Spears took a photo with a public figure who has a well-known criminal background including numerous drug charges. The public figure posted the photo on social media and it reflects poorly on the Agency.*

Once again, Trooper Spears's superiors could not identify any policy, rule, order, or law that he violated, so they just fabricated something.

25.     On April 1, 2015, the undersigned sent a letter to Defendant McCraw asking him to remove the "Counseling Record" forms from Trooper Spears's file and put a stop to the retaliation against Trooper Spears. The undersigned posted that letter on his blog, LawFlog.com, and the *Dallas Morning News* blogged about the incident later that day. The story quickly spread nationally and internationally and was published as far away as India, Africa, and Australia. Despite the nearly universal consensus that DPS's senior commanders were making fools of themselves and embarrassing the entire state, Defendant McCraw refused to reign in the misconduct within his agency.

26.     In a press release dated April 3, 2013, DPS officials suggested that the "Counseling Record" was not really discipline. That press release was duplicitous and disingenuous. DPS policy requires troopers to disclose all disciplinary incidents to their local district attorneys, and that policy further states that "counseling" is among the disciplinary incidents that must be disclosed to prosecutors. Moreover, "counseling" incidents can be

grounds for adverse employment actions against a trooper, yet DPS personnel are not allowed to appeal "counseling" incidents. Not surprisingly, "counseling" has become a preferred method of retaliation and selective enforcement. DPS superiors need not prove that any policy, rule, order, or law was violated, yet they can still punish a politically-disfavored trooper such as Trooper Spears without fear that the trooper will appeal.

## CLAIMS

*42 U.S.C. § 1983*

27. All prior paragraphs are incorporated herein by reference.

28. Trooper Spears brings claims for damages and injunctive relief against Defendants Jackson, Negri, Wilkie, Sanchez, Bradberry, Fleming, Gonzalez, Baker, and McCraw under 42 U.S.C. §1983 because they retaliated against him for exercising his right to petition for redress of grievances as guaranteed by the First Amendment to the U.S. Constitution.

29. Trooper Spears brings claims for damages and injunctive relief against Defendants Jackson, Negri, Wilkie, Sanchez, Bradberry, Fleming, Gonzalez, Baker, and McCraw under 42 U.S.C. §1983 because they denied him the equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

30. Trooper Spears brings claims for damages and injunctive relief against Defendants Jackson, Negri, Wilkie, Sanchez, Bradberry, Fleming, Gonzalez, Baker, and McCraw under 42 U.S.C. §1983 because they denied him due process of law as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

31. Trooper Spears brings claims for damages against Defendant Stokke under 42 U.S.C. §1983 for violating his right to be free from unreasonable seizure as guaranteed by the Fourth Amendment to the U.S. Constitution.

32.    All prior paragraphs are incorporated herein by reference.

33.    Trooper Spears brings claims for damages and injunctive relief against Defendants Jackson, Negri, Wilkie, Sanchez, Bradberry, Fleming, Gonzalez, Baker, and McCraw and State of Texas under the Texas Whistleblower Act, Section 554.001 et seq. of the Texas Government Code.

## JURY DEMAND

34.    The Plaintiff demands a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiff respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

**/s/ Ty Clevenger**

_____

Ty Clevenger
Texas Bar No. 24034380
1095 Meadow Hill Drive
Lavon, Texas 75166
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

Attorney for Plaintiff Billy L. Spears

# Appendix 2

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **Darren Lubbe,** | |
| Plaintiff, | |
| **v.** | |
| **Mark Milanovich, Christopher Mulch, Christopher Brock, Brian Perry, Brandon Negri, Jeoff Williams, Rhonda Fleming, Thomas G. Ruocco, Steven C. McGraw, Manny Flores, A. Cynthia Leon, Jason K. Pulliam, Randy Watson, Steven P. Mach, J. Pete Blair, John Curnutt, Russ Claggett, Marty Adcock, and Armando Ramirez,** | **Case No. 18-cv-1011** |
| Defendants | |

## ORIGINAL COMPLAINT

NOW COMES Darren A. Lubbe, the Plaintiff herein, alleging and stating as follows:

### Introduction

1.  Under Director Steven McCraw, a "good old boy" culture of cronyism and outright corruption has flourished at the Texas Department of Public Safety ("DPS").  On one hand, policy violations and even crimes have been covered up by DPS when senior commanders or favored personnel (usually Texas Rangers) were involved. On the other hand, senior commanders have forged documents and created rules after the fact in order to punish lower-ranking or disfavored personnel.

2.  The Plaintiff finds himself in the latter category. He was a highly decorated

investigator for the Texas Department of Public Safety ("DPS") in 2014 when his captain began pressuring him to attend the captain's "cowboy church." Whereas many of the Plaintiff's colleagues in Mt. Pleasant submitted to the captain's wishes and attended the "cowboy church," the Plaintiff refused, and that triggered an ongoing campaign of harassment from the captain and his cronies. In 2016, the plaintiff filed a complaint with the Equal Employment Opportunity Office ("EEO") at DPS headquarters in Austin, but that only made things worse. The captain found out about the EEO complaint, and a few months later the Plaintiff received the first negative performance evaluation of his entire career. The Plaintiff was harassed into an early retirement in late 2017, but according to emails obtained by the Plaintiff, senior DPS personnel continued to retaliate *after* his retirement by persuading officials at Texas State University to fire the Plaintiff from a teaching job.  Conversely, the captain was allowed to retire quietly even after DPS investigators confirmed that he had (1) violated the religious freedoms of the Plaintiff and (2) stolen state property.

3.   The Plaintiff did not particularly want to air DPS's "dirty laundry," but enough is enough. The Defendants were sworn to uphold the law, and they thumbed their noses at it. Now it's time to hold them accountable.

### JURISDICTION AND VENUE

4.   This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff asserts federal claims under 42 U.S.C. § 1983.

5.   Venue is proper in this Court because some of the Defendants reside in Travis County, Texas.

### PARTIES

6.  Plaintiff Darren Lubbe is a retired special agent with the Criminal Investigation Division ("CID") of the Texas Department of Public Safety ("DPS").

7.   Defendant Mark Milanovich is a retired CID captain who was stationed in Mount Pleasant, Texas.  He was a supervisor in the Plaintiff's chain of command.

8.   Defendant Christopher Mulch is a CID lieutenant stationed in Mount Pleasant, Texas.

9.   Defendant Christopher Brock is a CID special agent stationed in Mount Pleasant, Texas.

10.   Defendant Brian Perry is a CID special agent stationed in Mount Pleasant, Texas.

11.   Defendant Brandon Negri is a lieutenant in the DPS Office of Inspector General in Garland, Texas.

12.   Defendant Jeoff Williams is a major and the director of DPS Region 1 in Garland, Texas

13.   Defendant Rhonda Fleming is the DPS Inspector General in Austin, Texas.

14.   Defendant Thomas G. Ruocco, is the chief of the CID division Austin HQ, Texas.

15.   Defendant Steven C. McCraw is the director of DPS in Austin, Texas.

16.   Defendant Manny Flores is a member of the Texas Public Safety Commission, which oversees DPS.

17.   Defendant A. Cynthia Leon is a member of the Texas Public Safety Commission.

18.   Defendant Jason K. Pulliam is a member of the Texas Public Safety Commission.

19.   Defendant Randy Watson is a member of the Texas Public Safety Commission.

20.   Defendant Steven P. Mach is the chairman of the Texas Public Safety Commission.

21.   Defendant J. Pete Blair is the executive director of the Advanced Law Enforcement Rapid Response Training ("ALERRT") at Texas State University in San Marcos, Texas.

22.   Defendant John Curnutt is the assistant director of ALERRT.

23.   Defendant Russ Claggett is a senior regional manager for ALERRT.

24.   Defendant Marty Adcock is a regional manager for ALERRT.

25.  Defendant Armando Ramirez is a regional manager for ALERRT.

**FACTS**

26.  The Plaintiff worked as a CID special agent in Mt. Pleasant, Texas and received numerous awards from DPS and other agencies for his service. While he was working in Mt. Pleasant, his captain (Defendant Milanovich) and lieutenant (Defendant Mulch) repeatedly suggested that there was some impropriety or immorality in the Plaintiff's relationship with his wife.  In 2014, Captain Milanovich began criticizing the Plaintiff's religious devotion and pressuring the Plaintiff to attend the captain's church. Later in 2014, Captain Milanovich stood in the doorway to the Plaintiff's office and invited him to attend his church, making a comment that the Plaintiff would have to attend his church to be "accepted."  The Plaintiff responded by asking Captain Milanovich, "So does that mean that the only way I can be accepted is by going to your church?"  The captain replied, "Yes, you need to come to my church," and the captain seemed aggravated and agitated by the Plaintiff's question. This was ironic, because Captain Milanovich behaved like a foul-mouthed heathen during the week, yet he wanted everyone he worked with to know that he considered himself a devout Christian.

27.  In the years that followed, Captain Milanovich imposed double standards on the Plaintiff, *e.g.*, ordering the Plaintiff to shave his beard even though other undercover agents like the Plaintiff were permitted to wear beards. In fact, the Plaintiff was the only agent in Milanovich's district ever told to shave his beard.  The captain constantly harassed and threatened the Plaintiff about his service on the DPS Special Response Team, so much so that the Plaintiff ultimately was told by Captain Milanovich to quit the team. The captain also subjected the Plaintiff to baseless and retaliatory disciplinary write-ups, bullying, intimidation, and religious harassment.

28.  Some time prior to October 6, 2016, the Plaintiff sought and obtained permission

from his chain of command to replace the tires on his state vehicle. On October 6, 2016, the Plaintiff returned a tractor and farm truck that he had borrowed from Agent Chris Brock, and while returning the truck, trailer and tractor, the right rear tire on Agent Brock's farm truck blew out. The Plaintiff knew that Discount Tire did not resell the tires and that the tires would be shredded. He also knew that no money was exchanged for the used tires nor was there any DPS policy regarding disposal of the used tires. On October 7, 2016, the Plaintiff mentioned to Lt. Mulch that he blew a tire on Agent Brock's personal truck, and that he planned to let Agent Brock use the old tires from his state vehicle since those tires needed to be replaced before an upcoming trip to the Mexican border. Lt. Mulch did not object. Later that day, the Plaintiff replaced the tires on his state vehicle and told Agent Brock that he could pick up the old tires at Discount Tire in Mount Pleasant, Texas.

29. On October 10, 2016, the Plaintiff visited Captain Milanovich in the captain's office. The Plaintiff and Milanovich were the only DPS/CID personnel present due to the Columbus Day holiday, and the Plaintiff noticed that two of the four chairs were missing. The chairs were worth about $600 each. The Plaintiff asked the captain what happened to the chairs, and the captain appeared nervous before admitting, "I took them home." "Fuck the state," he said, "I'm getting mine." Milanovich then made retaliatory threats against a fellow agent in the Texarkana office. He also told the Plaintiff that he knew how the Plaintiff and the Plaintiff's wife met (insinuating an extramarital affair) and began telling the Plaintiff to start a new life and submit to the Lord. Captain Milanovich, who was the senior CID captain in the state, said he was angry because he had been passed over for promotion to major. The Plaintiff put the receipt for the purchase of truck tires on his administrative assistant's desk.

30. On October 12, 2016, Agent Brock had the Plaintiff's old work tires installed on his personal farm vehicle.

31.   After his conversation with the Plaintiff on October 10, 2018, Captain Milanovich became concerned that the Plaintiff might report him for stealing state property.  In an attempt to gain leverage over the Plaintiff, Captain Milanovich confronted him on October 13, 2016 about the price of the new tires and the captain asked the Plaintiff what happened to the old tires. The Plaintiff told Captain Milanovich that Agent Brock now had the old tires, and that Discount Tire wrote on the receipt "save old tires for customer".  The Plaintiff had nothing to hide and knew that he had not violated any law or department policy.  The captain nonetheless ordered the Plaintiff to make sure the used tires were returned to Discount Tire. Within an hour, the Plaintiff texted and placed a phone call to Agent Brock telling him to return the tires immediately per the captain's orders. The captain's office door was open and the Plaintiff spoke loud enough for the captain to hear the conversation.

32.   Later that day, Agent Brock called the Plaintiff, who was headed out of town for a work assignment on the Mexican border.  Brock said he was not going to return the old DPS tires, but was planning to return some old tires that Brock had in his barn, and that he intended to keep the old used tires that had been on the Plaintiff's work vehicle.  Agent Brock said he had some other old DPS tires in the barn, and knew that other DPS troopers kept old tires and put them on a personal trailer with permission from their sergeant. The Plaintiff repeatedly told Agent Brock not to lie, and to do what the captain said.  The Plaintiff knew that Agent Brock had a documented history of lying and trying to cover things up.

33.   On October 14, 2016, after repeated calls and directives from Captain Milanovich, Agent Brock returned the correct tires to Discount Tire.  Later that same day, Lt. Mulch called the Plaintiff, who was traveling to the Texas/Mexico Border, and asked the Plaintiff to write a statement about the tires and email it to him by the following Monday, which was October 17, 2016. Lieutenant Mulch also told Agent Brock to do the same.  On October 20, 2016, the

Plaintiff was ordered to return early from his assignment on the border.

34. On October 21, 2016, the Plaintiff met with Captain Milanovich, Lt. Mulch, and Agent Brock for an administrative inquiry. According to a recording of that meeting, Captain Milanovich suggested that the Plaintiff was not a good enough Christian, that he needed to "get his heart right with God," and that he needed to go the captain's church. Lt. Mulch never mentioned the fact that the Plaintiff informed him about his plans to give the old tires to Agent Brock, and that Lt. Mulch had never objected. The Plaintiff noticed that Captain Milanovich had returned the stolen chairs before the administrative inquiry, apparently because he recognized his own hypocrisy. Captain Milanovich told Agent Brock and the Plaintiff that he believed that there was no criminal act and that it just looked like bad judgment call and that Milanovich would talk to Major Jeoff Williams about it.

35. On the morning of Monday, October 24, 2016, the Plaintiff met with Lt. Mulch in his office about the bullying, unprofessional conduct, and theft of state property by Captain Milanovich. The Plaintiff also told Lt. Mulch about the years of religious harassment by Captain Milanovich. After the Plaintiff made the complaint to Lt. Mulch (which DPS policy required Lt. Mulch to report to headquarters), Lt. Mulch asked the Plaintiff, "Are you ready for the battle?" He then attempted to discourage the Plaintiff by saying, "I'm not your salvation." Lt. Mulch appeared to be frightened that the Plaintiff might report Captain Milanovich to higher authorities.

36. On November 2, 2016, Lt. Mulch, Agent Brock, and the Plaintiff met in Agent Brock's office. Lt. Mulch told them that a decision should be coming down from the major that day. After Mulch left, Agent Brock started telling the Plaintiff about all of the double standards and religious hypocrisy by Captain Milanovich. Agent Brock told the Plaintiff that Captain Milanovich kept DPS all-terrain vehicles and a trailer at his house and farm for personal use (in violation of DPS policy). Brock also told the Plaintiff that Milanovich had criticized Brock

about not going to his (Milanovich's) church and that Brock needed to get his heart right with

God. Brock stated to the Plaintiff that he was tired of the religious bullying that had been taking

place for the last few years.

37.  On Wednesday evening, November 2, 2016, Captain Milanovich called the Plaintiff,

who was getting ready for another special operations border mission.  Captain Milanovich told

the Plaintiff that he was not getting a C-1 (formal complaint), but was getting a regional written

reprimand and maybe an unscheduled evaluation and that the Plaintiff needed to resign from the

Special Response Team (a collateral duty).  The Captain told the Plaintiff to go ahead and go to

the border and to tell the Texas Ranger Special Operations Group that this was the Plaintiff's last

mission and that the Plaintiff would be resigning.  This devastated the Plaintiff, who had

developed considerable expertise in special operations and regularly taught classes on the

subject.

38.  On Thursday, November 3rd, 2016, the Plaintiff traveled to the border for his last

mission with the Texas Rangers.  Lt. Mulch called the Plaintiff and asked what the Plaintiff's

plans were in reference to the outcry that the Plaintiff made to Lt. Mulch about Milanovich, and

Lt. Mulch asked if the Plaintiff was going to file a complaint.  The Plaintiff was fearful that Lt.

Mulch would warn Captain Milanvoich, so he told Lt. Mulch that he was not going to complain.

39.  On November 14, 2016, the Plaintiff filed a complaint against Captain Milanovich

with DPS's Equal Employment Opportunity ("EEO") office.  Afterward, Lt. Mulch called the

Plaintiff and said he heard that the Plaintiff had filed an EEO complaint, and he seemed upset

with the Plaintiff. The Plaintiff does not know how Lt. Mulch learned about the complaint, which

was supposed to be confidential at that point.  The only plausible explanation is that someone

inside the Office of Inspector General notified the Plaintiff's chain of command. The Plaintiff

told Lt. Mulch that he had to stand up for what was right.  Lt. Mulch told the Plaintiff, "That's

why they call it a hard right and easy left," *i.e.*, Mulch suggested that the Plaintiff would regret filing the complaint.

40.   The Plaintiff was interviewed by DPS Office of Inspector General ("OIG") Lieutenant Patrick Heintz on December 22, 2016.  The following February, Lt. Mulch told the Plaintiff, "I hope you're right about this, because if you're not, well.... we will just get along." About a month later, Lt. Mulch told the Plaintiff, "The guys don't trust you," and "I don't know if we can ever get past this."

41.   On March 24, 2017, Lt. Mulch said he was under investigation for failing to report the Plaintiff's religious harassment complaint. Lt. Mulch again told the Plaintiff, "I don't know how we can ever get past this."  Lt. Mulch told the Plaintiff for the third time that it looked like the Plaintiff was retaliating against Captain Milanovich, and that he (*i.e.*, Lt. Mulch) and the captain had since become friends. Prior to that time, Captain Milanovich and Lt. Mulch did not get along with one another.  Lt. Mulch and Agent Brock then drove off together.

42.   In April of 2017, for the first time in his career, the Plaintiff received a negative annual performance evaluation. Lt. Mulch told the Plaintiff again that "the guys" did not trust him and that they thought the Plaintiff was "the enemy."  At that point, the Plaintiff was the most senior agent in the office, had been stationed in Mt. Pleasant since 2004, was highly decorated by DPS, had no previous negative evaluations or written reprimands, was an accomplished investigator, was the 1C District and Statewide Department tactics and medical instructor, and maintained a case load and statistics comparable to the other agents in Mt. Pleasant even though he was absent from the office during approximately 50% of his work hours due to his collateral job duties. Major Jeoff Williams, Captain Milanovich, and Lt. Mulch falsified the Plaintiff's annual evaluation in an attempt to retaliate against him for filing the EEO complaint.  The Plaintiff was immediately cut from all of the collateral and voluntary duties listed above, as well

as surveillance duties and assisting other agents in criminal investigations, training, and enforcement action. As a result, the Plaintiff's overtime pay was eliminated.  The Plaintiff was essentially assigned to "desk duty," and he knew that his chain of command was trying to set him up for termination.

43.   On June 8, 2017, the Plaintiff was interviewed by Lt. Brandon Negri of OIG.  During that interview, the Plaintiff was shown a copy of a statement wherein Agent Brock claimed that the Plaintiff tried to convince him to keep the old tires from the Plaintiff's state vehicle and instead return some older tires. In other words, Agent Brock lied and tried to blame the Plaintiff for his own scheme to keep the tires from the Plaintiff's vehicle.  At one point, Lt. Negri tried to intimidate the Plaintiff by claiming that the Plaintiff attempted to defraud the state.

44.   Lt. Negri expressed little interest in the fact that the Plaintiff had proof of the ongoing religious harassment in Mt. Pleasant. Instead, he was more concerned that the Plaintiff had used an audio recorder to get that proof. "Even though it is not a crime or violation of policy to record your supervisors, I was ordered by headquarters to tell you to stop recording them," Lt. Negri said. "I was told to tell you about the honor code." In other words, DPS commanders didn't mind the Plaintiff recording criminal suspects in the field, but it was a violation of the "honor code" to record criminal suspects who carried a DPS badge.

45.   Lt. Negri's statements were the first confirmation that the OIG investigation had been compromised by Director McCraw, Chief Ruocco, and Major Williams.  Whereas the inspector general and her inferior officers are supposed to operate outside the DPS chain of command and report directly to the DPS commission, Lt. Negri was nonetheless relaying orders from DPS "headquarters."  The Plaintiff asked Lt. Negri to report how the Defendants and the EEO process had mistreated him, but instead Lt. Negri buried the complaint. He never even wrote a report about his interview of the Plaintiff.

46.  On June 22, 2017, while driving his official vehicle, the Plaintiff witnessed a man running out of the woods with what appeared to be an assault rifle, then the man jumped into the passenger side of a waiting vehicle parked on the westbound shoulder of Interstate 30.  The Plaintiff's official vehicle was equipped with emergency lights and siren.  Believing the subject may have committed or was likely to commit a felony, the Plaintiff called dispatch for assistance and location of travel.  With no back up close by, the Plaintiff followed the vehicle into a dead end trailer park and initiated a felony traffic stop.  The Plaintiff activated the red and blue front and rear emergency lights, called in the location and was visually identified by front and rear "state police" markings and body armor.  It was later determined the rifle was a pellet gun, and the Plaintiff released the driver and passengers with no further action.  The Plaintiff reported the incident to Lt. Mulch the following day, June 23rd, 2017.

47.  On July 17, 2017, Lt. Mulch told the Plaintiff, "I am mad at you, but I can't discuss it because of the ongoing administrative investigation." He added, "One day, we will have a couple of beers and talk about it." On the same day, Lt. Mulch gave the Plaintiff a written disciplinary write-up (an "HR-31") for the traffic stop described above stating that the Plaintiff had violated the law and DPS policy.  In reality, the Plaintiff had not violated any laws or DPS policies, and Lt. Mulch did not criticize the traffic stop at the time the Plaintiff reported it.  The Plaintiff later found out that Major Williams, Captain Milanovich, and Lt. Mulch had asked OIG to initiate a C-1 investigation (*i.e.*, an employee misconduct investigation) of the above incident. OIG returned the complaint to Major Williams, however, explaining that no law or policy had been violated and OIG was not going to get involved.  Again, the Plaintiff was ordered to shave, change his daily dress to business casual, and report daily via email to Lt. Mulch, and he was informally punished and shunned. He was also ordered to take remedial classes designed for problematic employees, and he was directed to complete the classes within one year.

48. The Plaintiff is aware of similar circumstances wherein CID agents initiated felony traffic stops in plain clothes, but none of those agents were reprimanded or punished. In 2016, for example, CID Special Agents Danny Kelly and Josh Vera were returning to their Mt. Pleasant duty station when they noticed that they were being followed by a possible outlaw biker group. Agent Kelly and Vera followed the bikers to their residence and confronted them at gunpoint while Agent Kelly asked them, "You want some of this?" Agents Kelly and Vera were not identified by police markings or emergency red lights on their state vehicle. The bikers were not cited or arrested, and Lt. Mulch and Captain Milanovich did not reprimand Agents Kelly and Vera.

49. On July 21, 2017, Lt. Mulch approached the Plaintiff in his office and said he was going to discuss the Plaintiff's disciplinary write-up (for the aforementioned traffic stop) at an area meeting of CID agents. The Plaintiff responded that Lt. Mulch should not do that, as it would be further retaliation. The Plaintiff also learned that Agent Brock told another state trooper about the disciplinary write-up, even though the other trooper had no reason to know about it. Agent Brock did this in order to humiliate the Plaintiff and to further the other Defendants' retaliation against the Plaintiff.

50. On August 1, 2017, the Plaintiff received a second HR-31 regarding the July 21, 2017 traffic stop even though he had already received an HR-31 regarding the incident. Lt. Mulch said the purpose of the second HR-31 was to "document progress." The Plaintiff, however, researched DPS policy and learned that if a DPS Employee receives three HR-31's in a one-year span, he or she can be designated for an unscheduled evaluation. In other words, the DPS chain of command was building the pathway for his termination. The second HR-31 also reprimanded the Plaintiff for failing to complete the remedial classes designated in the first HR-31, even though only eleven days had passed since the first HR-31 and the Plaintiff had been

given one year to complete the classes.

51.  Prior to the August 1, 2017 counseling session, Lt. Mulch asked the Plaintiff how his wife was doing and where was she. The Plaintiff told Lt. Mulch, "She is down in Corpus Christi at a geology camp."  Lt. Mulch stated; "Oh, that's right, I saw on her Facebook post. Glad she is where she said she is."  Lt. Mulch said this to make the Plaintiff lose his composure, *i.e.*, by suggesting that the Plaintiff's wife was unfaithful and dishonest.

52.  On August 10, 2017, the Plaintiff met with Major Williams to report retaliation by the Plaintiff's supervisors.  Major Williams told the Plaintiff that it appeared as if the Plaintiff was the one who was retaliating against Captain Milanovich. Major Williams asked the Plaintiff when he was eligible for retirement, and the Plaintiff told him two years. Major Williams told the Plaintiff it would be a "long two years." Major Williams said the Plaintiff no longer had credibility among the people he worked with, and he should consider changing duty stations, *i.e.*, he should transfer out of Major Williams's region.   The Plaintiff told Major Williams that he could not move because his family could not move.  Major Williams told the Plaintiff, "You don't want people following you around," which the Plaintiff understood to be a threat.

53.  Toward the end of the August 10, 2017 meeting, Major Williams handed the Plaintiff written notice from Chief Ruocco that he was being suspended for five days without pay and placed on probation for six months as punishment for the used tire incident. Recall that Captain Milanovich had originally told the Plaintiff that the tire incident was minor and would not result in formal discipline. Thus the Defendants waited until a few months after the Plaintiff filed an EEO complaint – and more than a year after the incident happened – to punish the Defendant for something that they originally acknowledged was not a violation of law or policy. Agent Brock, meanwhile, received only a one-day suspension and six months of probation even after he was caught lying about what happened.

54. On August 11, 2017, the Plaintiff filed a retaliation complaint against DPS with the U.S. Equal Employment Opportunity Commission ("EEOC") in Dallas.

55. On August 22, 2017, the Plaintiff voluntarily took a polygraph test to evaluate whether he was telling the truth regarding the two affidavits and EEO complaints that the Plaintiff filed. (The Plaintiff had repeatedly asked DPS to administer a polygraph, but it never responded to his requests). On that same date, EEOC notified DPS about the Plaintiff's religious discrimination complaint.  The polygraph examiner found that the Plaintiff had been truthful, and those findings were transmitted to OIG/DPS on the same day.  Shortly thereafter, the Plaintiff received a letter dated July 27, 2017 from Chief Ruocco indicating that the Plaintiff's allegations against Captain Milanovich (*i.e.*, that he stole state property and engaged in religious discrimination) had been sustained and that the captain would be punished appropriately. Although the letter was dated July 27, 2017, it was postmarked August 25, 2017.  Chief Ruocco backdated the letter in response to the EEOC complaint and the polygraph results, namely to make it appear that DPS commanders had already decided to punish Captain Milanovich prior to the EEOC complaint. In reality, Chief Ruocco and Inspector General Rhonda Fleming were planning to cover up Milanovich's misconduct, but they were forced to change their plans when the Plaintiff filed his federal complaint.

56. On August 30, 2017, the Plaintiff met with Chief Ruocco to appeal his punishment. During that meeting, the Plaintiff provided Chief Ruocco with evidence proving that Captain Milanovich, Lt. Mulch, and Agent Brock lied and falsified government documents. Chief Ruocco responded that their answers were "vague," but he expressed no interest in whether they had violated the law or DPS policy.  The Plaintiff's appeal was overruled.  On September 11, 2017, the Plaintiff sent an email to Director McCraw asking for a final appeal to the director, and that request was approved.

57.  On September 12, 2017, the Plaintiff submitted an open records request to support

his appeal.  In response to that request, DPS produced some emails, but it failed to produce the

June 8, 2017 interview of the Plaintiff by OIG Lt. Brandon Negri.  DPS claimed that the CID

chain of command never got a report from Lt. Negri, even though Lt. Negri had documented

proof (*i.e.*, audio recordings and corroborating witness statements) of religious harassment.  As

noted above, Lt. Negri was supposed to conduct an independent investigation, but instead he

conducted a sham investigation and was nothing more than a tool for senior DPS commanders.

58.  Under the leadership of Defendant Fleming, the entire Office of Inspector General

has become the "Office of Damage Control."  Rather than preserve the independence of her

office, she allows it to operate as an arm of Director McCraw and his senior staff, mainly for the

purpose of protecting Director McCraw, his senior staff, and their cronies from embarrasment or

unwanted scrutiny. Defendant Fleming knew that her office was conducting sham investigations,

including the sham investigation of the Plaintiff's EEO complaint, and she tried to cover up

Captain Milanovich's misconduct at the expense of the Plaintiff. She had no interest in

preventing retaliation against the Plaintiff, and her office confirmed Captain Milanovich's

misconduct (as reflected in Chief Ruocco's backdated letter) only *after* the Plaintiff took his

complaint to federal officials.

59.  On September 28, 2017, the Plaintiff and his attorney, Pete Schulte, met at DPS

headquarters in Austin with Director McCraw and DPS attorneys.  Director McCraw agreed that

the Plaintiff's punishment was too harsh and said he did not believe that the incident

compromised the Plaintiff's integrity in any way as a CID special agent. The director further told

the Plaintiff that he was "going to find out what the hell is going on in Mt. Pleasant," and he

asked to keep the notebook that the Plaintiff prepared.   A few days later, the Plaintiff was

contacted by Lt. Mulch to come to the DPS Mt. Pleasant office, where Captain Milanovich and

Lt. Mulch gave him a letter from Director McGraw.  In the letter, the director reduced the

Plaintiff's punishment from 5 days off and 6 months probation to one (1) day off and no

probation. While this was an improvement, the complaint should have been dismissed outright

insofar as the Plaintiff never violated any law or DPS policy.

60.  Notwithstanding the polygraph results, on November 3, 2017 the DPS chain of

command ordered the Plaintiff transferred outside of Region 1.  The Plaintiff could not relocate

his family and incur the additional cost of two residences, and he feared that senior DPS

personnel would retaliate further in a different region, so he was forced to retire effective January

31, 2018 (his last work day was December 22, 2017 because of accrued leave time).

61.  As a result of his impending retirement, the Plaintiff sought to take on more teaching

responsibilities at Texas State University, where he worked as an adjunct instructor in the

Advanced Law Enforcement Rapid Response Training ("ALERRT") program. On November 30,

2017, the Plaintiff was terminated from ALERRT without warning.

62.  On September 10, 2018, the Plaintiff obtained emails among Defendants Blair,

Curnutt, Claggett, Adcock, and Ramirez indicating that Major Williams had contacted them and

persuaded them to terminate the Plaintiff from ALERRT, purportedly because the Plaintiff

lacked credibility and integrity.  Major Williams did so in retaliation for the Plaintiff's EEO and

EEOC complaints.  Defendants Blair, Curnutt, Claggett, Adcock, and Ramirez had reason to

know that Major Williams was retaliating, but they terminated the Plaintiff under false pretenses

and without any attempt to hear both sides of the story.

63.  As of late 2017, the Plaintiff had spent a year investigating the case of a sixteen-year-

old Wood County girl whose relatives had been trading her for sex in exchange for drugs since

she was eleven years old.  Lt. Mulch, Agent Brock and Agent Brian Perry met with Wood

County Sheriff Tom Castloo, Deputy Chief Bobby Sanders, District Attorney Jim Wheeler, and

District Attorney's Investigator Jerry Hirsch around that time and told the Wood County officials that the Plaintiff lacked credibility and integrity. Lt. Mulch, Agent Brock, and Agent Perry were acting at the direction of Major Williams and Captain Milanovich.  As a result of their false statements about the Plaintiff, the Wood County DA refused to prosecute the cases.  The Office of Attorney General later filed charges against some of the sex traffickers, but not all.

64.  Around the same time in late 2017, Lt. Mulch and Agent Brock met with Assistant U.S. Attorney Jonathan Ross in Texarkana for the purpose of smearing the Plaintiff's reputation. The Plaintiff had been working a year-long undercover investigation into a large methamphetamine distribution network in Camp County and surrounding areas, but Lt. Mulch and Agent Brock told Mr. Ross that the Plaintiff lacked integrity and credibility.  As a result, Mr. Ross initially declined to prosecute the case.  Lt. Mulch and Agent Brock were acting at the direction of Major Williams and Captain Milanovich.

65.  On December 22, 2017, the Plaintiff's last day at work, Captain Milanovich and Lt. Mulch gave the Plaintiff his last performance evaluation, and they omitted and altered facts in order to portray the Plaintiff in a bad light. In other words, even after DPS had sustained the Plaintiff's misconduct allegations against Captain Milanovich, and even after Lt. Mulch got in trouble for failing to report the religious harassment, DPS commanders nonetheless allowed the two men to write a false and defamatory performance evaluation of the Plaintiff.  Meanwhile, the DPS administrative assistant in Mt. Pleasant, Sharon Walker, was told by Captain Milanovich that he had no intention of notifying DPS headquarters about the Plaintiff's retirement. Normally, DPS sends out a department-wide announcement when a trooper or agent retires. Ms. Walker notified headquarters on her own initiative.

66.  After the Plaintiff retired, Captain Milanovich, Lt. Mulch and Agent Brock began retaliating against Ms. Walker because she had cooperated with the OIG investigation and told

the truth about how they treated the Plaintiff. In February of 2018, she received her first negative

performance evalualion of her 20 years with DPS, and she was subjected baseless and bad-faith

criticism from the three men.  She retired two months later because of the stress of working

under Captain Milanovich, Lt. Mulch, and Agent Brock.

67.  Although DPS investigators confirmed that Captain Milanovich had stolen state

property, retaliated against the Plaintiff, and engaged in religious discrimination, senior

commanders nonetheless permitted him to retire quietly in August of 2018 as if nothing had ever

happened. Lt. Mulch and Agent Brock, meanwhile, suffered no adverse personnel action

whatsoever.

68.  The Plaintiff incorporates by reference the ORIGINAL PETITION from *Billy Spears v.*

*Texas Department of Public Safety, et al.*, Case No. 1:15-cv-511-RP (W.D. Tex.)(hereinafter

"*Spears I*"), which is attached as Appendix 1. The Plaintiff further incorporates by reference the

FIRST AMENDED COMPLAINT from *Billy Spears v. Steven McCraw, et al.*, Case No. 1:17-cv-1105-

RP (W.D. Tex.)(hereinafter "*Spears II*"), which is attached as Appendix 2.   Defendants McCraw

and Commissioners Mach, Flores, Leon, Pulliam, and Watson have adopted an unwritten policy

that permits DPS commanders to retaliate against lower-ranking DPS personnel according to

their whims and prejudices. DPS has a strong "good old boy" culture that allows DPS

commanders to play favorites and create double standards as they see fit. Notwithstanding

repeated notice of such unlawful practices – both in litigation and media reports – the Defendants

named in this paragraph have demonstrated deliberate indifference.

69.  A fatal traffic wreck involving Texas Ranger David Armstrong of Dallas is a good

example of the double standards inside DPS.  On February 2, 2017, Ranger Armstrong was

returning from a special operations shift on the Mexican border when he crashed his DPS vehicle

into a pickup truck, ejecting both the driver and the passenger.  After several weeks, a DPS

Highway Patrol accident reconstruction team was able to recover the vehicle's computer to confirm his speed at the time of the crash.  He was driving 84 miles per hour on Highway 281 in Premont, where the posted speed limit was 45 miles per hour.  Ranger  Armstrong fractured his hip, and his DPS vehicle burned down to the metal. The passenger of the other vehicle, 30-year-old JD Kristopher Trevino of Premont, died of his injuries five days after the wreck. Even though the accident occurred in Premont city limits, and even though accidents in municipalities are normally investigated by city police, DPS handled the investigation so it could cover up what happened. Among other things, Ranger Armstrong was violating a DPS safety rule at the time of the accident. That rule mandates that officers working on the border take a six-hour rest period before driving home, and the rule had been in effect for more than a year at the time of the accident. Ranger Armstrong had repeatedly violated the rule  – a fact known to his supervisors – and he was violating it again when he was driving through Premont at 10:15 p.m.  Although most drivers would have been charged with manslaughter, criminally negligent homicide, or at least reckless driving, Ranger Armstrong was never charged with anything, nor was he disciplined.  Instead, the entire incident was covered up by senior DPS commanders, and Ranger Armstrong is now leading a high-profile investigation into a police shooting in Dallas.

70.  In January of 2018, DPS supervisors discovered that Ranger Brent Davis was involved in an ongoing sexual relationship with Faezeh Pour Mogahdam Horaney of Longview. That might not be noteworthy but for the fact that Ranger Davis was also leading the investigation into the May 30, 2016 murder of Mrs. Horaney's husband, Ronald "Ron" Horaney, a well-known businessman who was gunned down in front of his house.  According to rumors within DPS, Ranger Davis helped Mrs. Horaney recover proceeds from her husband's life insurance policy. Either way, Ranger Davis badly compromised the murder investigation, rendering his testimony worthless at trial and raising questions about whether he diverted

investigative attention away from his mistress.  Notwithstanding his gross misconduct and potential criminal activity, he was allowed to keep working for DPS as a law enforcement officer. Senior DPS commanders quietly demoted him from Ranger to trooper, but they told him that he would be eligible to re-apply for appointment as a Ranger within one year, *i.e.*, as soon as January of 2019.

71.  On February 27, 2017, Ranger Michael Smith was involved in a road rage incident in Round Rock, Texas. After another driver "flipped him off," Ranger Smith initiated a traffic stop and drew his gun on the other driver.  Ranger Smith had no probable cause for the traffic stop, and the driver was released without a citation after Round Rock police responded to the scene. Body camera video from Round Rock officers showed that Ranger Smith lied to the local police while trying to explain what happened.  The incident was kept quiet until July 14, 2017, when Austin television station KXAN broadcast the body camera video and reported inconsistencies in Ranger Smith's story. At the time of the broadcast, DPS issued a written statement that "corrective action" had been taken against Ranger Smith, but he was not demoted at that time, much less terminated (like most other officers would have been). In November of 2018, Ranger Smith was finally demoted from ranger to trooper, most likely because of subsequent misconduct.

72.  In 2011, Senior Ranger Captain Antonio "Tony"" Leal had a traffic accident while driving drunk.  According to the other driver, Leal flashed his badge and offered to pay her if she kept quiet about the wreck. No charges were filed against Leal, and he was allowed to retire as if nothing had happened.  Another ranger was a passenger in Leal's car at the time of the accident, and apparently he was drunk as well.  The other ranger kept quiet about what happened, and he is now one of the top DPS officials in Austin.

73.  Around 2011, Agent Brock wrecked a DPS vehicle in Titus County while driving

drunk, but he did not report the incident until the following day, much less the fact that he had

been driving drunk. Captain Milanovich learned about the drunk driving incident but helped

cover it up, and he prevented Brock from being terminated. In the years before and after, Agent

Brock often called DPS personnel while they were on duty and asked them to drive him home

from a bar because he was drunk.  On other occasions, Agent Brock showed up for work with

enough alcohol on his breath to be noticed by co-workers and even a local justice of the peace.

Prior to the drunk-driving accident, Agent Brock was disciplined for lying about a part-time, off-

duty job. He was required by DPS policy to report the job, but he failed to do so and then lied

about the job when he was questioned. These facts were reported to OIG investigators and were

well known to Agent Brock's supervisors for many years, yet he was never disciplined for his

alcohol-related misconduct.

74.  *Spears I* and *Spears II* (*see* Paragraph 68 above) further illustrate the corruption and

cronyism in DPS.  In *Spears I*, Defendant McCraw first retaliated against Trooper Spears for (1)

reporting another officer's misconduct and (2) allowing himself to be photographed with Snoop

Dogg. After *Spears I* made international headlines, senior DPS personnel retaliated further by

fabricating a record in Trooper Spears's employee file in an attempt to terminate him. In October

of 2017, Upshur County District Attorney Billy Byrd investigated the forgery and referred it to

the Office of the Attorney General ("OAG") for further investigation and/or prosecution. OAG

quickly referred the matter back to DPS, even though (1) OAG had its own investigators on staff;

(2) DPS had an obvious conflict of interest; and (3) the case easily could have been referred to

the district attorney's offices in Travis County or Dallas County. So why was the case referred

back to DPS?  Because OAG also wanted to cover up the forgery. As of November 21, 2017,

Trooper Spears had filed *Spears II*, wherein he asserted civil claims against the DPS personnel

who tried to frame him and fire him.  Those DPS personnel were being defended in federal court

by none other than OAG.  Meanwhile, DPS  referred the forgery investigation to the Texas

Rangers Division, which closed the case *without ever interviewing any of the witnesses*.  The

Rangers Division then referred the matter to OIG, even though OIG investigates only violations

of DPS policies and procedures, and even though forgery is obviously a crime.

75.  Rather than interview the corroborating witnesses, OIG immediately tried to

interview Trooper Spears.  Once again, OIG investigators were doing damage control for DPS

commanders, namely by trying to find out what DPS would be facing in *Spears II*.  Trooper

Spears's attorney objected to an OIG interview about matters pertaining to his ongoing civil

litigation, and OIG relented. Unfortunately, OIG investigators made no effort to interview other

witnesses until October of 2018, when Trooper Spears's attorney publicly called for a special

prosecutor. Even now, OIG personnel are trying to whitewash the forgery. On or about

November 12, 2018, an investigator for the Dallas County District Attorney's Office informally

questioned DPS witnesses about the forgery. One week later, OIG Lt. Rick Lopez called one of

those witnesses and asked her what the DA investigator had called about. In other words, Lt.

Lopez was more concerned about damage control than investigating the forgery.

<u>CLAIMS</u>

*42 U.S.C. § 1983*

76.  All Defendants are sued in their individual capacities only, and all prior paragraphs

are incorporated herein by reference.

77.  The Plaintiff brings claims for damages against all Defendants under 42 U.S.C.

§1983 because they (1) retaliated against him for exercising his rights as guaranteed by the First

Amendment to the U.S. Constitution; (2) conspired with other Defendants who retaliated; or (3)

failed to supervise those who retaliated.

78.  The Plaintiff brings claims for damages and injunctive relief against all Defendants

under 42 U.S.C. §1983 because they (1) denied him the equal protection of the laws as guaranteed by the Fourteenth Amendment to the U.S. Constitution; (2) conspired with other Defendants who denied his equal protection rights; or (3) failed to supervise those who denied his equal protection rights.

79.  The Plaintiff brings claims for damages and injunctive relief against all Defendants under 42 U.S.C. §1983 because they (1) denied him due process of law as guaranteed by the Fourteenth Amendment to the U.S. Constitution; (2) conspired with other Defendants who denied him due process; or (3) failed to supervise those who denied him due process.

*State Law Claims*

80.  All Defendants are sued in their individual capacities only, and all prior paragraphs are incorporated herein by reference.

81.  The Plaintiff brings claims against Defendant Williams for tortious interference with business relations, tortious interference with contract, business disparagement, and defamation insofar as he interfered with the Plaintiff's ALERRT teaching job.  The Plaintiff further asserts these claims against the other Defendants insofar as they were part of the larger civil conspiracy to retaliate against the Plaintiff.

82.  The Plaintiff brings claims against Defendant Williams, Captain Milanovich, Lt. Mulch, Agent Brock, and Agent Perry for defamation and business disparagement insofar as they spread malicious falsehoods about his character to prosecutors and other law enforcement agencies. The Plaintiff further asserts these claims against the other Defendants insofar as they were part of the larger civil conspiracy to retaliate against the Plaintiff. The Plaintiff still teaches law enforcement training classes, and the Defendants harmed his chances of getting teaching jobs because of the damage to his reputation.

## REQUEST FOR RELIEF

83.   The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; back pay; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Darren Lubbe**